UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

ALEX MARSHALL,

                          Plaintiff,              Civil Action No.: 13-cv-11860
                                                  Honorable Bernard A. Friedman
              v.                                  Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.
_____/


## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 13]

Plaintiff Alex Marshall brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in assessing Marshall's credibility, and as a result composed a factually inaccurate hypothetical question. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [13] be DENIED, Marshall's motion [8] be GRANTED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REVERSED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS REPORT

AND RECOMMENDATION.

## II.   REPORT

### A.   Procedural History

On September 9, 2010, Marshall filed applications for DIB and SSI, alleging disability as of April 25, 2009.  (Tr. 142-53).  Both claims were denied initially on January 31, 2011.  (Tr. 84-91).  Thereafter, Marshall filed a timely request for an administrative hearing, which was held on September 26, 2011, before ALJ Elliott Bunce.  (Tr. 32-54).  Marshall, represented by attorney Jeffrey Adkin, testified, as did vocational expert ("VE") Tim Shaner.  (*Id.*).  On October 12, 2011, the ALJ found Marshall not disabled.  (Tr. 18-31).  On February 26, 2013, the Appeals Council denied review.  (Tr. 1-6).  Marshall filed for judicial review of the final decision on April 25, 2013.  [1].

### B.   Background

#### 1.   *Disability Reports*

In a September 16, 2010 disability report, Marshall reported that the conditions preventing him from working are "shoulder" and "left leg."  (Tr. 189).  He reported that he is 5'5" tall and weighs 220 pounds.  (*Id.*).  He reported that his conditions cause him pain and that he stopped working because of them.  (*Id.*).  He reported taking no medications for his conditions, nor seeking treatment with any doctors.  (Tr. 191-92).

In a September 5, 2010 function reported, Marshall reported that he lives in a house alone.  (Tr. 167).  He reported that his conditions limit his ability to work because he is unable to "lift heavy items" and that his "leg gives out at any time."  (*Id.*).  His day consists of eating, watching television and reading.  (Tr. 168).  He has trouble sleeping due to shooting pain.  (*Id.*).  He also has trouble reaching certain areas with his left arm, making it difficult to bathe and dress.

2

(*Id.*).  He is able to prepare simple meals, wash dishes, clean the bathroom and do laundry.  (Tr. 169).  He reported needing assistance with lawn care and some household chores.  (*Id.*).

Marshall reported that he goes out daily and is able to drive a car and go out alone.  He shops in stores for groceries monthly.  (Tr. 170).  He enjoys reading and talking with others.  (Tr. 171).  Marshall reported that his conditions impede his ability to lift, squat, stand, reach, bend, walk, sit, kneel, climb stairs, complete tasks and use his hands.  (Tr. 172).  He reported that "it hurts to lift certain items" and that his "leg gives out at times."  (*Id.*).  He has no trouble paying attention, following instructions or getting along with others, and he handles stress "okay."  (Tr. 172-73).

In a February 16, 2011 appeals report, Marshall reported that his condition had worsened since his last report and that he now suffers severe pain in his shoulder and leg and has difficulty with any physical activity.  (Tr. 206).  He reported no new limitations as a result of his worsening condition.  (*Id.*).  He also reported seeking treatment with a doctor for his shoulder and leg and has been prescribed Flexeril, Naproxen, Neurontin and Vicodin.  (Tr. 207-208).

### 2.    *Plaintiff's Testimony*

At the hearing, Marshall testified that he first stopped working in April 2009 after suffering injuries as a result of an automobile accident, which included a torn rotator cuff and detached tendon in his left shoulder, as well as a left leg injury.  (Tr. 38-39; 42).  He had previously suffered a left leg injury and has undergone six surgeries on that leg since 1993, including the placement and later removal of hardware.  (Tr. 47).  He went back to work in October of that year, but left in January 2010 to undergo surgery to repair the torn rotator cuff and detached tendon.  (Tr. 39).  He attempted to return to work in July of that year, but worked less than one week before his condition made work impossible for him.  (Tr. 39-40).  When

asked about why his social security statement for 2010 showed income of $10,000 if he only worked one week that year, Marshall testified that the income had been derived from paid sick leave.  (Tr. 40-41).

Marshall testified that he does not perform any chores around the house, and merely lies down and watches television all day or naps, as he only gets 1-2 hours of sleep at night.  (Tr. 42; 48-49).  He testified that he has difficulty putting on pants due to his conditions.  (Tr. 49).  He testified that he takes medication both for pain and for his inability to sleep but neither are effective.  (Tr. 43-44).  He also testified that his Naproxen prescription has the side effect of elevating his blood pressure but he takes blood pressure medication to control it.  (Tr. 44).

Marshall testified that he cannot lift anything with his left arm due to his condition, and cannot lift anything with his right arm due to the fact that he holds a cane in that hand.  (Tr. 45). He testified he was prescribed the cane by his doctor four months prior to help him walk and stabilize himself, as his leg often gives out on him, causing him to fall two to three times a day. (Tr. 42-45; 49).  Marshall testified that he cannot reach his left arm above his head, cannot walk long before needing to rest, and can only sit or stand for a short period of time before needing to alternate position.  (Tr. 42; 45-46).  He further testified that when sitting he needs to elevate his leg to waist height to relieve pressure.  (Tr. 48).

### 3.   Medical Evidence

#### a.   Treating Sources

##### i.   Prior to Alleged Onset Date

On August 12, 2008, Marshall was evaluated by Dr. Stephen Burton, an orthopedic surgeon, for complaints regarding his left ankle and both knees.  (Tr. 325).  Marshall reported pain and discomfort as well as some tingling and numbness that he related to an injury that

occurred in 1993.  (*Id.*).  An examination revealed good stability in both knees with general tenderness in the left knee.  (*Id.*).  The lower extremities generally had good color, warmth and sensation, and there was good motion in both ankles.  (*Id.*).  There was decreased sensation along the lateral aspect of the left foot and leg "but it is difficult[] to find a dermatomal pattern."  (*Id.*). Dr. Burton noted that x-rays of both knees showed no significant degenerative changes, with similar results in the ankle x-ray.  (*Id.*).  Being concerned about Marshall's numbness, Dr. Burton ordered an EMG, as well as blood work to rule out an infection.  (Tr. 326).  An August 22, 2008 EMG of Marshall's left leg was normal.  (Tr. 331).

At a follow-up on September 3, 2008, Marshall was informed that his EMG results were negative.  (Tr. 324).  Dr. Burton prescribed a course of physical therapy and prescribed Lidoderm patches.  (*Id.*).  Marshall began therapy on October 8, 2008.  (Tr. 296).  He reported significant swelling, difficulty walking, stair climbing and standing secondary to stiffness in his knee, as well as knee buckling.  (*Id.*).  He rated his pain at 8-9/10 and stated that the pain had been continuing for the past four months.  (Tr. 297).  He reported decreased pain with rest, and difficulty sleeping.  (*Id.*).  An exam revealed noted hypersensitivity on the right anterior knee, leg and ankle, and the medial aspect of the left leg, knee and ankle, as well as swelling on the left medial knee and in the left lateral ankle.  (*Id.*).  Marshall's gait was found to be antalgic with marked decreased weight transfer acceptance in the left leg.  (*Id.*).  He had full range of motion in his right knee and some decreased range of motion in his left with "minimal end-range pain." (*Id.*).  He had 4/5 strength in his right knee and 3+/5 in his left.  A course of therapy was prescribed and implemented.  (Tr. 298).

Marshall attended only three out of twelve therapy appointments, cancelling three times and failing to show for another six.  (Tr. 300).  He was discharged due to poor compliance.  (Tr.

300-301).  Marshall informed the therapist during a phone call that his condition remained unchanged.  (Tr. 300).  During this period, Marshall had two scheduled appointments with his primary physician Dr. B. Bhagat, one of which he missed.  (T. 339).  At neither appointment did he discuss his knee problems or any other pain.  (*Id.*).  Instead, he received a prescription for a smoking cessation program.  (*Id.*).  At an appointment with Dr. Bhagat on December 8, 2008, the only notes are that Marshall was given samples of Lyrica.  (*Id.*).  He failed to show for a January 8, 2009 appointment.  (*Id.*).

ii.    *After Alleged Onset Date*

On April 25, 2009, Marshall was in a motor vehicle accident and was treated in the emergency room for pain in his ribs, left ankle and left shoulder.  (Tr. 277).  An exam revealed left lateral and posterior tenderness, as well as lumbar spine tenderness.  (Tr. 278).  His extremities were all found to be within normal limits.  (*Id.*).  An x-ray of his left ankle revealed chronic changes of the distal tibia "likely related to prior trauma" and mild tissue swelling, but no acute fracture.  (Tr. 284).  An x-ray of Marshall's lumbar spine found "[n]o evidence of fracture or malalignment."  (Tr. 285).  An x-ray of his left shoulder suggested "chronic Hill-Sachs and Bankart fractures from prior dislocation, as well as degenerative changes at the acromion and acromionclavicular joints.  (Tr. 285-86).  Marshall was prescribed Vicodin, Naproxen and Valium and released in good condition.  (Tr. 279).

He returned the next day complaining of neck and shoulder pain as well as left arm tingling.  (Tr. 266).  It was initially suspected that he sustained a cervical spine fracture at C4, (Tr. 262), but this was ruled out by an MRI and CT scan.  (Tr. 269; 271).  The MRI, however, did find mild cervical spondylosis with anterior spurring at C4-C5.  (Tr. 269).  A CT scan of Marshall's left shoulder found mild degenerative changes.  (Tr. 272).  An exam revealed

6

tenderness and limited cervical range of motion secondary to pain and stiffness.  (Tr. 267).
Marshall exhibited 4/5 grip strength with occasional parasthesias in his left hand.  (*Id.*).  He was
able to actively move his shoulders, elbows, wrists and finger.  (*Id.*).  He was diagnosed with a
muscular strain of the cervical spine and recommended to continue wearing his cervical collar.
(*Id.*).

On May 5, 2009, Marshall presented to Dr. David Fernandez, an orthopedic specialist,
complaining of pain in the right side of his neck, but no numbness of his extremities.  (Tr. 322).
An exam revealed diffuse tenderness in the paraspinal and midline soft tissues.  (*Id.*).  Head
compression elicited pain but no radicular symptoms.  (*Id.*).  His motor strength was at least 5-,
but showed break away secondary to neck pain.  (*Id.*).  His lower extremities had full strength
except his left ankle, which was 4+/5 secondary to pain.  (*Id.*).  Dr. Fernandez suspected a
myofascial injury but ordered a cervical spine MRI for further evaluation.  (Tr. 323).  He stated
that based on the outcome of the MRI, he would likely refer Marshall to physical therapy.  (*Id.*).
He also prescribed Skelaxin and Ibuprofen 800.  (*Id.*).  Marshall was recommended to be off
work for 4-6 weeks (Marshall reported his job as a sanitation worker which required "a lot of
lifting"), but that he believed Marshall "should eventually go back to work."  (Tr. 322-23).[1]  A
May 10, 2009 MRI of Marshall's cervical spine showed no evidence of central canal narrowing
or a focal cervical disc herniation and no evidence of an occult fracture or ligamentous injury.
(Tr. 330).

On June 9, 2009, Dr. Fernandez referred Marshall to Dr. Matthew Hettle, a physiatrist.
(Tr. 319-321).  Marshall presented in his cervical collar, complaining of neck, left shoulder and
low back pain.  (Tr. 321).  Upon examination, Marshall demonstrated almost no active range of

---

[1] Marshall also had an appointment with Dr. Bhagat this same day, but there are no written notes
of the appointment beyond the date.  (Tr. 339).

motion in his cervical spine. (*Id.*). His reflexes were normal as was his strength testing. His range of motion in both shoulders was passively full, but caused pain. (*Id.*). A straight leg raising test was negative. (*Id.*). Dr. Hettle suspected a cervical strain, lumbar strain and probable seat belt injury to the left shoulder. (*Id.*). He ordered a shoulder MRI and physical therapy. (*Id.*). A June 15, 2009 MRI of Marshall's left shoulder revealed a nondisplaced SLAP I lesion and a "partial tear of the anterior inferior fibers of the supraspinatus tendon at its insertion upon the greater tuberosity." (Tr. 329).

Marshall began therapy on June 17, 2009. (Tr. 247). He reported difficulty standing and walking secondary to leg pain, and difficulty moving his left shoulder, turning his head or looking up or down. (*Id.*). He rated his pain between 8-10/10 in all areas and difficulty sleeping due to pain. (Tr. 248). He also complained of tingling in both hands. (*Id.*). An exam revealed intact reflexes and muscles. (*Id.*). The therapist noted Marshall had a forward head posture, appeared guarded and ambulated in a flexed position with an antalgic gait. (*Id.*). His cervical range of motion was limited actively but full passively, his lumbar testing was within normal limits, but he displayed limited range of motion in certain areas. (Tr. 248-49). He had a positive impingement test in his left shoulder and a positive stress test at L4-L5. (*Id.*). His leg strength was 4/5 bilaterally. (*Id.*). His shoulder range of motion was also limited. (*Id.*). A course of therapy was issued and administered. (Tr. 250).

A June 25, 2009 progress report revealed improved function, strength and less pain, but no change in Marshall's ability to perform activities of daily living. (Tr. 241). On July 23, 2009, Marshall was discharged from therapy with regard to his neck and back after attending all twelve sessions, but was recommended to continue therapy for his shoulder. (Tr. 242). At the time of discharge, Marshall rated his neck pain at a 2/10 and his lower back pain at a 3/10. (*Id.*).

After a break in therapy while Marshall was seeking re-referral, he returned for treatment beginning August 17, 2009. (Tr. 243). He reported worsening of his shoulder due to decrease in activity. (*Id.*). An August 27, 2009 progress report continued to show regression in Marshall's range of motion and strength, and no change in his pain level. (Tr. 244). He was discharged from therapy and sent back to his physician for follow-up. (*Id.*; Tr. 251-52).

During this period, Marshall continued to be followed by Dr. Hettle and other orthopedic doctors. At a July 7, 2009 appointment with Dr. Hettle, Marshall complained that his left shoulder pain was worsening, but that his back and neck pain was improving. (Tr. 317). He resisted most range of motion exercises with his left shoulder. (*Id.*). He was referred to orthopedics for a surgical evaluation. (Tr. 318). Dr. Hettle predicted "maximum medical improvement in approximately 8 weeks" and ordered that Marshall "not engage in heavy work at this time." (*Id.*). Marshall was evaluated by Dr. Martin, an orthopedic surgeon, on July 9, 2009. (Tr. 314). Dr. Martin noted that Marshall's condition was "really very interesting" because "he has severe complaints of pain which are really quite out of proportion to anything that I can see on his x-rays or his MRI." (*Id.*). Dr. Martin gave Marshall an injection in his shoulder which provided a little relief and slightly increased his range of motion, but Dr. Martin noted that Marshall's "pain is still remarkably out of proportion to his finding." (*Id.*). Dr. Martin concluded that Marshall was not a surgical candidate, and needed to maximize his therapy. (*Id.*).

Marshall returned to Dr. Hettle on July 27, 2009. (Tr. 311-12). Marshall reported no lower back pain "as long has he is not doing any heavy lifting" and that his neck pain was improving. (Tr. 312). Dr. Hettle found Marshall's neck and lower back to be at maximum medical improvement. (*Id.*). However, he recommended a second opinion for Marshall's shoulder, and managed his medications. (Tr. 313). At a follow-up appointment on August 11,

2009, Dr. Hettle reiterated that he saw no "significant disability related to" Marshall's neck and lower back pain. (Tr. 309). However, an exam revealed a significantly decreased range of motion in Marshall's left shoulder with significant complaints of pain. (*Id.*). Dr. Hettle's recommendation for a second opinion was still pending, and he indicated that given Marshall's "lack of improvement in spite of physical therapy" he did not 'have much left to offer this patient," and that Marshall could return as needed. (Tr. 309-10).

Marshall was also treated by his primary physician Dr. Bhagat three times during this period. (Tr. 339). However, the only notes are from a July 29, 2009 appointment where Dr. Bhagat prescribed a steroid cream and noted that Marshall had an appointment with a "Dr. Pack" on September 1, 2009, regarding his shoulder. (*Id.*). No records from a Dr. Pack are found in the file, however. Marshall returned to Dr. Bhagat on September 4, 2009, informing him that Dr. Pack stated that they do not usually perform surgery on Marshall's type of lesion. (Tr. 341). An exam revealed decreased range of motion and decreased strength in the left shoulder. (*Id.*). Dr. Bhagat suggested deferring to the specialist. (*Id.*).

Marshall returned to Dr. Hettle on September 21, 2009, reporting that the second opinion also did not recommend surgery. (Tr. 306). On exam, Marshall complained of severe anterior shoulder pain with range of motion, and Dr. Hettle noted 80 degrees of active forward flexion, and 90 degrees of passive. (Tr. 306). He ordered an EMG and suggested that Marshall may want to seek another surgical opinion given the lack of any other conservative treatment available to him. (Tr. 307). Dr. Hettle kept him off work until October 15. (*Id.*). A September 30, 2009 EMG and nerve conduction study was normal. (Tr. 327-28). Marshall returned to Dr. Hettle again on October 19, 2009, reporting that he had been working despite his off-work slip due to the fact that he was not receiving disability pay. (Tr. 303). He further reported that his

primary care physician was going to refer him for another surgical opinion. (*Id.*).  Dr. Hettle wrote Marshall an off-work slip for another two weeks, but did not prescribe any medication. (*Id.*).

On November 5, 2009, Marshall presented to Dr. Bhagat for a complete physical.  (Tr. 338).  Dr. Bhagat recommended a third opinion from the University of Michigan for Marshall's shoulder, but noted that "he is back to work."  (*Id.*).  An exam revealed decreased range of motion in both abduction and adduction rotation in Marshall's left shoulder but that it was "[d]ifficult to assess as the patient has lots of significant pain."  (*Id.*).

Marshall underwent a consultation with Dr. Bruce Miller, an orthopedic surgeon at the University of Michigan, on December 9, 2009.  (Tr. 335).  Upon exam, Dr. Miller noted tenderness in the AC joint, limited elevation to 100 degrees actively and 160 degrees passively, with external rotation to 30 degrees and internal to just above the belt.  (T. 335-36).  Marshall showed some weakness with external rotation, but otherwise had satisfactory strength.  (Tr. 336).  His signs were consistent with impingement, but his grip strength, circulation and sensation were all intact.  (*Id.*).  An ultrasound was consistent with the previous MRI results finding a partial-thickness bursal-sided supraspinatus tear and signs consistent with impingement.  (*Id.*).  Dr. Miller performed an injection to confirm his suspicion of irritation in the subacromial space. (*Id.*).  The injection gave Marshall some relief, although he continued to have trouble with overhead activity.  (*Id.*).  After a discussion, Marshall elected to undergo surgery.  (*Id.*).

Marshall underwent surgery in January 2010.  (Tr. 362).  He presented for a 1-week follow-up with Dr. Miller on January 29, 2010, where Marshall reported continued pain at night even with medication.  (*Id.*).  His medications were managed.  (*Id.*).  Dr. Miller advised it would be 3-4 months before Marshall could return to full work duties.  (*Id.*).  At a second follow-up on

February 8, 2010, Marshall reported "no complaints" and was issued a prescription to begin physical therapy. (Tr. 361).

Marshall began physical therapy on February 18, 2010. He reported difficulty sleeping and laying on his back as well as difficulty performing his exercises as instructed. (Tr. 227). He rated his pain at a 9/10. (*Id.*). His range of motion was 40 degrees passively in his shoulder; his gait was unremarkable. (Tr. 228). A course of therapy was developed and implemented. (*Id.*). Marshall attended twelve therapy sessions over the course of a month, and the therapist noted improvement in his range of motion, strength, pain level and ability to engage in activities of daily living. (Tr. 226). However, Marshall continued to report significant pain that was 4-5/10 in his daily activity and 7-8/10 when using his arm. (*Id.*). The therapist suggested an extension of therapy may benefit him. (*Id.*). However, he was ultimately discharged from therapy due to a lack of insurance. (Tr. 230-31). Marshall sought a Norco refill from his doctor on March 19, 2010, complaining of pain that rated 9/10. (Tr. 357). When NSAIDs were suggested to him he responded that he had tried them and they did not work so he threw away the bottle. (*Id.*). He wanted Norco, according to the notes "because we told him we would give him more." (*Id.*). Ultimately, a physician assistant prescribed him another round of Norco with no refills. (Tr. 358).

A June 21, 2010 ultrasound ordered by Dr. Miller showed "[f]ocally severe soft tissue thickening with hyperemia overlying the postsurgical portion of the supraspinatus tendon in the region of the bursa" and "[a]ssociated impingement with dynamic maneuvers." (Tr. 365). Marshall returned to Dr. Miller's office on September 23, 2010, continuing to complain of left shoulder pain. (Tr. 347). He reported receiving an injection after his June ultrasound that "helped for one day." (*Id.*). He also complained of pain from his neck to his left hand. (*Id.*).

An exam revealed forward elevation to 150 degrees with positive impingement signs.  (*Id.*).  There was no specific tenderness over the bicep tendon or AC joint, and he was able to offer good resistance to internal and external rotation.  (*Id.*).  His active external rotation was slightly limited actively but not passively.  (*Id.*).  X-rays of his shoulder were unremarkable, as were x-rays of his cervical spine (albeit with a loss of lordosis present).  (*Id.*; 352; 364).  Dr. Miller ordered an MRI of Marshall's left shoulder and referred him to the Spine Clinic for his neck symptoms.  (*Id.*).

Marshall returned to Dr. Miller on October 11, 2010.  (Tr. 349).  He reported continued pain "with overhead activities and mostly in the anterior aspect of his shoulder."  (*Id.*).  Upon exam, Marshall could forward flex to 130 degrees with positive impingement signs.  (*Id.*).  He had good resistance to rotation, externally rotating to 35 degrees actively and 45 degrees passively.  (*Id.*).  Dr. Miller performed a subacromial injection, which provided Marshall with 80% pain relief.  (*Id.*).  As a result of this outcome, he suggested Marshall undergo a left shoulder arthroscopy with subacromial decompression and biceps tenotomy.  (*Id.*).  An x-ray taken the same day of Marshall's sternoclavicular joint was limited due to overlapping structures but revealed no definite fracture.  (Tr. 351).

Marshall began treating with a new primary physician, Dr. Wilkerson, on December 23, 2010.  (Tr. 375).  He complained of chronic leg pain that had been intermittent since 1993 when he sustained a tibial fracture requiring plate and screw fixation that was removed due to infection.  (*Id.*).  He reported that he had traditionally worn a knee brace and a cane, but does not at this time.  (*Id.*).  He stated that his knee gives out on him and that his pain is severe and "may prevent his ambulation."  (*Id.*).  He was not taking any medication, however.  (*Id.*).  He was also not able to describe any exacerbating or alleviating factors.  (*Id.*).  Marshall also complained of

13

left shoulder pain and limited mobility. (*Id.*). An exam revealed that Marshall was unable to abduct his left arm and had very limited forward motion. (Tr. 376). He was also very sensitive to touch on his left leg and foot. (*Id.*). The nurse-practitioner ordered x-rays and gave Marshall prescriptions for Vicodin, Neurontin, Naprosyn and Flexeril. (*Id.*). X-rays taken on January 24, 2011, showed mild degenerative changes in Marshall's left knee, old residuals of a previous tibial fracture in his left ankle, and no evidence of acute abnormality in his left lower leg. (Tr. 378-80). There was also no evidence of acute abnormality in Marshall's left shoulder, although the x-ray noted "hypertrophic bone change or small exostosis at the level of the left scapula just medial and inferior to the glenoid process." (Tr. 381).

At a follow-up on February 9, 2011, Marshall continued to complain of left shoulder pain, reporting that he had originally planned to follow up with Dr. Miller for more surgery, but did not because he had lost his job and insurance. (Tr. 374). An exam revealed Marshall to be in mild distress with an obvious antalgic gait favoring his left leg. (*Id.*). He was unable to abduct his left arm in any direction more than 60 degrees and his strength in that arm was 3/5. (*Id.*). The nurse practitioner referred Marshall for an orthopedic consultation and renewed his medications. (*Id.*).

Marshall treated with Dr. Fernandez on February 10, 2011. (Tr. 382). Marshall reported continued pain in his left shoulder post-surgery. (*Id.*). He stopped physical therapy due to pain. (*Id.*). An exam revealed active movement of the left arm to 50 degrees of forward flexion and abduction and passive to about 80 degrees flexion and 70 degrees abduction. (*Id.*). It also revealed atrophy of the left shoulder musculature. (*Id.*). There were no further findings because "he says it is terrible pain in his shoulder" and "[h]e really did not allow me to do much [of an] exam of his shoulder at all." (*Id.*). Dr. Fernandez diagnosed developing left shoulder adhesive

14

capsulitis/impingement syndrome with mild degenerative joint disease. (Tr. 383). He prescribed physical therapy and recommended continued movement. (*Id.*).

On March 3, 2011, Marshall was evaluated by Dr. Matthew Sardelli, another orthopedic surgeon at the same clinic. (Tr. 407). An exam revealed tenderness anteriorly over the anterior portal and a hard nodule in the area. (*Id.*). The doctor was able to elicit forward elevation to 50 degrees actively and 75 degrees passively, active external rotation to neutral, passive to 10 degrees, and internal rotation actively and passively measured to hip pocket. (*Id.*). Dr. Sardelli ordered an MRI to rule out a repeat tear, and also suggested the possibility of an infection. (*Id.*). A left shoulder MRI taken on March 21, 2011, showed no repeat tear. (Tr. 423). At a March 31, 2011 follow-up with Dr. Sardelli, Marshall continued to have limited range of motion and pain in his left shoulder. (Tr. 417-18). Dr. Sardelli diagnosed adhesive capsulitis and recommended injections and physical therapy, noting that Marshall would be off work during this time. (Tr. 418). In the interim, Marshall was also treated by his primary care practice, where a significant limitation in his range of motion was noted as well as atrophy of his left shoulder muscles. (Tr. 377).

Marshall underwent a steroid injection in his left shoulder on April 15, 2011. (Tr. 422). He began physical therapy for his shoulder on April 25, 2011. (Tr. 429-31). Marshall reported difficulty with self- care, flexibility, grasping objects, lifting, performing home management and job responsibilities, reaching overhead and repetitive movements of his hand, arm and shoulder. (Tr. 429). He reported his pain was at best 6/10 and at worst 10/10. (*Id.*). An exam revealed a severely reduced range of motion in his left arm and 3- strength in that arm also. (Tr. 429-30). He further had positive impingement signs and reduced grip strength. (Tr. 430). A course of therapy was put in place. (Tr. 431). Marshall underwent therapy from April 25, 2011 to June

16, 2011.  (Tr. 437-62).  Despite initial reports that he had a very low threshold for the modalities and was unable to tolerate stretching (Tr. 441-42; 445-46), Marshall appeared to make some progress, and by the end of May or the beginning of June was exercising without increasing pain and had a "close to full" passive range of motion, although the therapist noted that modalities had done little to reduce his pain.  (Tr. 457-59).  A note from June 9, 2011 revealed a belief that Marshall's pattern was "non-capsular" and that his range of motion was "more limited by muscle guarding as compared to capsular tightness."  (Tr. 461).  Ultimately, Marshall was discharged from therapy due to a lack of progress in terms of pain relief.  (Tr. 462).

During this therapy period, Marshall was seen by Dr. John Kohn at a pain management center for an evaluation regarding thoracic and lower back pain.  (Tr. 416).[2]  Dr. Kohn requested diagnostic studies to be conducted before examining Marshall further.  (*Id.*).  Marshall returned to Dr. Kohn on June 24, 2011, after being terminated from physical therapy.  (Tr. 414-15).  In the interim, he had undergone lumbar spine x-rays, which were negative.  (Tr. 424).  Marshall complained of low back pain that originally stemmed from a car accident, but that had increased over the last two years.  (Tr. 414).  He reported that it interfered with his daily activities and sleep and that he was terminated from his job in 2010 due to pain.  (*Id.*).  He rated his back pain as 10/10.  (*Id.*).  He also reported pain in his left leg.  (*Id.*).  Upon exam, Marshall exhibited a markedly antalgic gait, and a "somewhat exaggerated response to pain on palpation of his paraspinous muscles."  (Tr. 415).  There was "extreme tenderness" and "mild left sciatic notch tenderness," deep tendon reflexes were hypoactive and muscle strength was difficult to assess

---

[2] Marshall also saw a nurse-practitioner in Dr. Wilkerson's office on May 26, 2011.  (Tr. 389). He reported inability to sleep and lower extremity swelling upon walking, although no edema was noted on exam.  (*Id.*).  He reported being compliant with physical therapy.  (*Id.*).  The nurse managed his medications and requested a follow up after his appointments with pain management and orthopedics.  (*Id.*).

16

due to patient guarding.  (*Id.*).  A straight leg raising test was "equivocally positive" on the left. (*Id.*).  Dr. Kohn recommended a CT scan of the lumbar spine and would see Marshall back if degenerative changes were present.  (*Id.*).

Marshall returned to Dr. Hettle on June 30, 2011, presenting for failure to respond to physical therapy for a frozen shoulder.  (Tr. 395).  Dr. Hettle was able to elicit passive forward elevation to 80 degrees, external rotation to 30 degrees and internal rotation to L5-S1, but all movements continued to be painful.  (*Id.*).  He recommended Marshall treat with a pain specialist as he did not believe surgery would help.  (*Id.*).

Marshall returned to Dr. Kohn on July 25, 2011, after a July 14, 2011 CT scan of lumbar spine revealed a "small right paracentral L5-S1 disc protrusion [that] mildly abuts the traversing right S1 nerve root" and "mild facet degenerative changes." (Tr. 399).  Dr. Kohn noted that the CT scan "showed absolutely no evidence of neuroforaminal narrowing on the left," and although there was "a small right paracentral disc protrusion at L5-S1" it was "apparently clinically silent." (Tr. 413).  He recommended a left leg EMG, and opined that if the EMG was negative, Marshall's pain was likely due to his chronic degenerative leg changes from his fracture and hardware.  (*Id.*).  An August 10, 2011 EMG of Marshall's left leg was normal.  (Tr. 409).

On July 11, 2011, Marshall returned to Dr. Hettle for a follow-up.  (Tr. 397).  Dr. Hettle noted that Marshall had been discharged from therapy and that the report had stated he did not have a frozen shoulder.  (*Id.*).  He also reported no relief from steroid injections.  (*Id.*).  An exam revealed "no obvious atrophy" and easily obtainable reflexes.  (Tr. 398).  Marshall "resist[ed] range of motion of the left shoulder" and was "painful in every single direction." (*Id.*).  Dr. Hettle concluded that Marshall's "physical exam does not suggest a specific diagnosis causing any shoulder pain," and that Dr. Hettle had nothing left to offer Marshall.  (*Id.*).

17

On the same day, Marshall treated with a nurse practitioner in Dr. Wilkerson's office, complaining of right leg pain and needing more blood pressure medication. (Tr. 388). No physical exam was conducted, but the nurse wrote him a prescription for a straight cane, noting that he was currently "using a cane from physical therapy." (*Id.*). Also on the same day, Marshall began a course of physical therapy for his left leg. (Tr. 432-34). He reported leg pain stemming from his old tibia fracture in 1993. (Tr. 432). He reported his leg being tender and painful, wanting to give out and also pinching in the knee. (*Id.*). He reported trouble with standing, walking, transferring, climbing stairs, performing house and job tasks, stating he could not work due to the pain. (*Id.*). He rated his pain at an 8/10 at best and 10/10 at worst. (*Id.*). An exam revealed normal hip range of motion, with pain on extension and hip strength that ranged between 3+ and 4- in most areas (with normal adduction strength). (Tr. 433). He had reduced range of motion and strength in his left knee, positive lateral pull sign and patellofemoral grind test, as well as positive ligament stability tests. (*Id.*). He also exhibited a decreased heel/toe progression. (*Id.*). A course of therapy was developed and implemented. Marshall attended twelve therapy sessions from July 14, 2011 through October 5, 2011, with no real improvement in his condition noted (although the substance of the treatment notes is very sparse). (Tr. 463-78). A lower leg function self-evaluation form that Marshall completed on August 25, 2011 showed his leg to be worse following six weeks of physical therapy than it had been at the beginning. (Tr. 435).

On August 3, 2011, Marshall treated with a nurse practitioner at Dr. Wilkerson's office. (Tr. 387). He complained that his right knee "feels like there is a rock in it." (*Id.*). The nurse noted no swelling on exam. (*Id.*). She administered a steroid injection into his right knee and ordered an x-ray. (*Id.*). On August 23, 2011, Marshall treated with Dr. Sardelli, complaining of

bilateral knee pain.  (Tr. 401).  An exam revealed tenderness throughout the knees but no effusion.  X-rays revealed no fracture or dislocation and joint spaces were intact.  (Tr. 402).  Dr. Sardelli noted "[t]here may be some flattening of the femoral condyle medially" on the left and "may be some spur forming immediately off of the femur" on the right.  (*Id.*).  He administered an injection in both knees.  (*Id.*).

Marshall returned to Dr. Kohn on September 16, 2011 for a follow-up, subsequent to his normal EMG.  (Tr. 392).  Dr. Kohn opined that Marshall's leg pain was likely secondary to his hardware and his back pain was likely myofascial.  (*Id.*).  He recommended increasing Marshall's Flexeril dosage or changing the medication, but did not believe he would benefit from interventional procedures or nerve blocks.  (*Id.*).  On September 20, 2011, Marshall treated with a nurse practitioner at Dr. Wilkerson's office.  (Tr. 386).  He complained of burning in his knees since his steroid injections, but "did not seem to be that concerned with it."  (*Id.*).  The nurse managed his medications, discussed weight loss and sleep modifications, but noted that Marshall "[d]id not really make any commitments to lifestyle modifications."  (*Id.*).  She noted that Marshall "walks with a cane."  (*Id.*).

### b.    *Consultative and Non-Examining Sources*

On December 21, 2010, Marshall underwent a consultative examination with Dr. Samiullah Sayyid for the state of Michigan.  (Tr. 366-68).  He complained of left shoulder and left leg pain.  (Tr. 366).  Marshall reported that he could not lift his left arm above the shoulder and that he used a cane and left knee brace after his fracture, "but not anymore," because the cane was stolen.  (*Id.*).  He reported not taking any medications.  (*Id.*).  An exam revealed Marshall to be moderately obese and looking depressed.  (Tr. 367).  He was unable to perform rapid alternating hand movements on the left and also unable to perform a heel-to-shin test on the

left.  (*Id.*).  His cervical and lumbosacral spine had slightly reduced movement.  (*Id.*).  His left shoulder, hip and knee joints also had reduced movement.  (*Id.*).  His fine and gross dexterity was normal in his right arm but reduced in the left "due to chronic left shoulder pain."  (*Id.*).  His grip strength was intact bilaterally.  (*Id.*).  His stance and posture were normal, he was unable to squat or walk on heels and toes, and found it difficult to get on and off the table.  (Tr. 368).  Dr. Sayyid's "impression" recited Marshall's history of trauma and injury, and then noted "[c]onstant pain in the left shoulder and significant restriction of movements, constant pain in the left leg, and limping heavily."  (*Id.*).  His "conclusion" was "This 41-year-old male patient has worked hard prior to coming to Flint from Indiana in 2002.  Then he had worked in various factories and grocery stores and had worked in a pickle factor up here in Flint.  At the present time he is on FIA."  (*Id.*).

Dr. Sayyid also filled out a neurologic and orthopedic supplemental report, finding Marshal capable of sitting, standing, bending, stooping "with pain and difficulty," carrying, pushing and pulling less than 10 pounds, buttoning clothes, tying shoes, dressing, opening a door, making a fist and picking up a coin or pencil.  (Tr. 369).  He was unable to squat and had no adiadochokinesis on his left side.  (*Id.*).  He had a negative straight leg raising test, but needed a walking aid to reduce pain.  (*Id.*).

### 4.    *Vocational Expert's Testimony*

VE Tim Shaner testified at the hearing that Marshall's past relevant work classifications ranged between light and medium in exertion and between 2 and 3 in skill level.  (Tr. 51).  The ALJ then asked the VE to imagine a hypothetical claimant of Marshall's age, education background and vocational experience, "who is able to perform work at the light exertional level, that does not require overhead work, or more than occasional reaching with the non-dominant

arm." (Tr. 51-52).  The ALJ asked if there were any unskilled, entry level jobs in the national

economy that such an individual could perform.  (Tr. 52).  The VE testified that there were,

including usher (164,000 jobs nationally), counter clerk (108,000 jobs), and information clerk

(83,000 jobs).  (*Id*.).  The ALJ then modified the hypothetical to limit the claimant to only

sedentary work.  (*Id*.).  The VE testified that the claimant could still perform the jobs of

surveillance system monitor (16,000 jobs), information clerk (83,000 jobs) and order clerk

(19,000 jobs).  (Tr. 52-53).  The VE testified that these sedentary positions would allow the

worker to alternate between sitting and standing at will, and also would allow for elevation of the

leg at the work station up to 6-8 inches above the ground.  (Tr. 53).  However, the VE testified

that these occupations would not permit elevation of the leg above 8 inches (except at breaks and

at lunch) or permit the worker to take naps during the day.  (Tr. 53-54).

### C.        Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic

work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Marshall not disabled.  At Step One, he found "some inconsistencies" in Marshall's report that he only worked one week in 2010 and derived the remainder of $10,000 of income for that year from sick leave.  (Tr. 23).  The ALJ noted there was no documentation supporting this allegation.  (*Id.*).  However, the ALJ concluded that since he was able to resolve Marshall's claim at Step Five, he did not need to pursue this issue further.  (*Id.*).  At Step Two, the ALJ found the following severe impairments: degenerative joint disease of the non-dominant (left) shoulder, degenerative joint disease of the knee and obesity.  (Tr. 24).  At Step Three, the ALJ concluded that none of Marshall's severe impairments, either alone or in combination, met or medically equaled a listed impairment,

22

specifically comparing them against Listing under §1.00, and stating that he also considered Marshall's obesity as required by the regulations.  (Tr. 24).  Next, the ALJ assessed Marshall's residual functional capacity ("RFC"), finding him capable of performing "work that does not require: exertion above the light level . . .; or overhead work, or more than occasional reaching with the non-dominant arm."  (*Id.*).  At Step Four, the ALJ found that Marshall could not return to his past relevant work.  (Tr. 26).  However, at Step Five, the ALJ concluded that Marshall's background, coupled with his RFC and VE testimony, demonstrated that there were a significant number of other jobs in the national economy that he could still perform.  (Tr. 27-28).  Thus he was found not disabled.  (Tr. 28).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's

decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Marshall takes issue with the ALJ's assessment of his credibility, his evaluation of the medical evidence, and his reliance on VE testimony that he claims was in response to an inaccurate hypothetical question. The Court notes that Marshall's brief, filed by his counsel, Richard Doud, is similar to the one Doud filed in *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325,

24

2014 WL 1207865, at *1, fn. 1 (E.D. Mich. Mar. 24, 2014), which Chief Judge Rosen found to be patently deficient; rather than synthesizing the facts and law into a coherent and properly-developed legal argument, the brief relies principally on "conclusory assertions and [suffers from the] absence of developed argument." *Id.* While the brief contains argument headings which suggest that the ALJ erred in his evaluation of the medical evidence, in assessing Marshall's credibility, and in formulating the hypothetical presented to the VE, the actual arguments are, at best, skeletal in nature, and at worst, nonexistent. Marshall's brief consists almost entirely of large swaths of block quotes from cases, some of which are on point, and some of which lay out standards not even argued as applicable to this case (such as the treating physician's rule).

The Court finds that Marshall's "argument" that the ALJ failed to "properly evaluate the medical records of evidence" is entirely waived as it is undeveloped beyond simply being stated in the argument section's only heading. *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("[I]ssues averted to in some perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."). However, Marshall's other arguments, that the ALJ erred in assessing his credibility and in forming his hypothetical question for the VE, though not well-presented, are well-taken and warrant remand here.[3]

---

[3] Marshall's brief identifies certain portions of his testimony, as well as certain pieces of medical evidence, that he asserts support his subjective allegations of disability. [8 at 10-12]. However, he fails to link the two together in a way that explains why the ALJ's credibility assessment was erroneous. This is not a proper approach to raising issues of alleged error with the Court. *See Fielder*, 2014 WL 1207865, at *2, fn. 4 ("the Court rejects this challenge as without merit, where Plaintiff's 'divide and conquer' approach to the ALJ's credibility assessment unduly overlooks the collective weight of the several reasons given by the ALJ for discounting Plaintiff's credibility."). Nevertheless, he has done enough, barely, to apprise the Court of his arguments so that it may consider them.

### 1.    *Credibility*

Marshall takes issue with the ALJ's assessment of his credibility, but in doing so, conflates two distinct matters; the *existence* of severe impairments and the *impact* those impairments have on his functional capabilities.  Although Marshall purports to be attacking the latter, his "analysis" merely points to certain pieces of evidence which show the existence of impairments.  [8 at 11].  Indeed, based on the medical evidence, the ALJ did find that Marshall suffered severe impairments related to his shoulder and knee, and that those conditions "could reasonably be expected to cause the alleged symptoms."  (Tr. 24, 25).  *See also* Tr. 26 ("Based on these treatment records, I can reasonably find that [Marshall] has limitations associated with [degenerative joint disease] of the non-dominant left shoulder, [degenerative joint disease] of the knee, and obesity, but I cannot reasonably find that they impose limitations which would preclude work with the RFC adopted here.").

The real issue then – which Marshall touches on only vaguely – is whether the ALJ's *reasons* for discounting Marshall's credibility were valid and supportable.  The ALJ proffered a single reason for concluding that Marshall's testimony that his shoulder impairment was disabling was not credible, and two other reasons for concluding that his testimony with regard to his leg pain was not credible.  For the reasons discussed below, the Court finds that the ALJ's proffered reasons are not supported by substantial evidence.

The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Thus an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  When a complaint of pain is in issue, after the ALJ finds a medical condition that could

reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

The Court finds that the ALJ erred in assessing Marshall's credibility with regard to both his shoulder and leg pain and functionality. An ALJ may not reject a claimant's subjective complaints of pain simply due to an alleged lack of objective medical findings. 20 C.F.R. § 404.1529(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Yet, a critical review of the ALJ's decision reveals that his credibility finding rests only on a purported absence of such corroborative medical evidence, and that in actuality, at least some medical evidence does support Marshall's subjective complaints of pain and functional limitations.

Here, the ALJ found Marshall's testimony regarding his shoulder pain and limitations not credible, stating only that "the objective evidence does not support a claim of no function" and reciting certain medical records. (Tr. 26). This approach violates 20 C.F.R. § 404.1529(c)(2)'s mandate, and at any rate is factually incorrect. The ALJ's decision does not fairly address Marshall's subjective claims of debilitating shoulder pain, and, as noted above, the medical record contains numerous pieces evidence which support Marshall's testimony of severe pain and a lack of function in his left shoulder. This includes exam findings noting a severely limited range of motion in that arm, positive impingement signs and the ineffectiveness of various

27

methods of treatment on his pain, including surgery, physical therapy and injections.  (Tr. 347; 349; 377; 382; 395; 397-98; 418; 429-30; 457-59; 462).  While the ALJ was not obligated to discuss every piece of evidence in the record, he was required to note and resolve the conflict presented by this competing evidence in passing on Marshall's credibility.

With regard to Marshall's left leg impairment, the ALJ's decision is equally, if not more suspect.  The ALJ discredited Marshall's testimony about his use of a cane on the grounds that he did not find such a prescription in the record.  (Tr. 26).  The ALJ further found that the record did not establish a period of 12 consecutive months during which there would reasonably be restrictions in Marshall's gait.  (Tr. 26).  Neither of these reasons is supported by substantial evidence.  First, the record shows clear objective evidence of leg pain, including repeated findings of an antalgic gait, and documented evidence of Marshall's difficulty in several postural moves.  (Tr. 368; 374; 402; 414-15; 433; 435; 463-78).  Second, the ALJ's statement that there was no prescription for a cane in the record is clearly inaccurate.  (Tr. 388).  Finally, the durational standard for an impairment is not whether it has existed for the 12 months preceding the decision, but whether it *could be expected* to last for at least 12 months.  *See Davis v. Colvin*, No. 12-14862, 2013 U.S. Dist. LEXIS 143549, *37 (E.D. Mich. Aug. 26, 2013) (*citing Owen v. Apfel*, 7 Fed. Appx. 408, 410 (6th Cir. 2011) (claimant was correct that benefits analysis not dependent on when she saw doctor, but rather upon how long impairment was expected to last)). The ALJ does not address this aspect of the durational requirement.  For all of these reasons, the ALJ's credibility determination, as it relates to Marshall's leg impairments, is not supported by substantial evidence.

Finally, these errors are not overcome by the ALJ's reliance on the only opinion evidence of record – that of consulting physician Dr. Sayyid, who found that Marshall was capable of

lifting, carrying and pushing and pulling less than 10 pounds with his left arm, and capable of standing, sitting, and bending, while needing a cane to walk, all of which correspond to a sedentary job classification.  (Tr. 26, 369).  The ALJ failed to explain with sufficient specificity the weight he gave to that opinion or the reasons for giving it the weight he did.  Instead, he simply wrote, "As for the opinion evidence, I am giving significant weight to the objective evidence of record."  (Tr. 26).  The conclusion this statement was attempting to convey is not at all apparent.  Moreover, it seems to ignore that a substantial amount of the "objective evidence of record" does support Marshall's contentions.  Thus, assuming the ALJ meant to indicate that he was relying on Dr. Sayyid's opinion as a basis for finding Marshall not credible, the Court is unable to determine whether that reliance is supported by substantial evidence.

In sum, the ALJ's ultimate credibility determination is not supported by substantial evidence of record, and this matter should be remanded to the ALJ for a proper credibility determination.

### 2.    *Adequacy of Hypothetical Question*

Because the ALJ erred in assessing Marshall's credibility with regard to both his shoulder and his leg pain, the Court finds that substantial evidence does not support the ALJ's RFC assessment, the hypothetical questions he posed to the VE, or his ultimate conclusion that Marshall is not disabled.  The ALJ's finding that Marshall had occasional use of his right arm, despite significant evidence supporting Marshall's claims to the contrary, renders the ALJ's hypothetical questions, and the VE testimony issued in response, to not be supported by substantial evidence.  Additionally, the ALJ failed to address Marshall's claimed need to take frequent naps during the day due to pain, a claim that is both supported by the record[4] and that,

---

[4] Marshall testified that he took frequent naps during the day due to his inability to sleep at night

according to the VE, would preclude him from sustaining gainful activity.  (Tr. 54).

For these reasons, the ALJ's conclusion that Marshall is not disabled is not supported by substantial evidence of record, and the case should be remanded for further consideration consistent with this Report and Recommendation.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Marshall's Motion for Summary Judgment **[8]** be **GRANTED**, the Commissioner's Motion **[13]** be **DENIED** and this case be **REVERSED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS REPORT AND RECOMMENDATION**.

Dated: April 30, 2014                              s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                              United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this

---

as a result of pain, and that he took medication to help him sleep.  (Tr. 44; 48).  The ALJ did not specifically address this allegation in his decision.  While no specific sleep medication appears to have been prescribed to him, the record does support that Marshall's doctors prescribed certain doses of pain and other medication to aid in his sleep.  (362-63; 386; 389).  The record is also replete with evidence of Marshall's continuous complaints of sleep problems due to pain.  (Tr. 222; 226-28; 259-61; 262; 357; 386; 389; 414; 437-38; 441; 481; 498).  In light of the foregoing, this is a matter that the ALJ should discuss on remand.

Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 30, 2014.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

31